UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JAMES VINCENT BANKS, | Case No. 2:20-cv-00556-MMD-NJK |
| Plaintiff, | ORDER |
| v. | |
| JOSEPH LOMBARDO, *et al.*, | |
| Defendants. | |

## I.    SUMMARY

*Pro se* Plaintiff James Vincent Banks filed a civil rights complaint under 42 U.S.C. § 1983 against Defendants Daniel Holm, Russell Thompson, Ryan Heiss, Michael Riesepow, David Bryan, and Parker Miller (collectively, "Defendants"[1]) based on events that occurred while he was in pretrial detention at the Clark County Detention Center ("CCDC"). (ECF No. 1-1 ("Complaint").) The Court previously screened the Complaint under 28 U.S.C. § 1915A. (ECF No. 5.) Before the Court are Defendants' motion for summary judgment on Plaintiff's remaining three claims (ECF No. 111 ("Motion")[2]) and

---

[1]The Court previously granted as unopposed Defendants Gregory Bryan and James Williamson's motions to dismiss all claims against them under Local Rule 7-2(d). (ECF Nos. 32, 35, 104, 116.) Thus, the Court dismissed Plaintiff's Eighth Amendment deliberate indifference to a serious medical need claim against Bryan and Fourteenth Amendment equal protection and due process claims against Williamson. However, Local Rule 7-2(d) creates an exception for motions filed under Fed. R. Civ. P. 56. For those motions, such as Defendants' Motion, the Court independently reviews the motion and supporting evidence even if the motion is unopposed.

[2]Plaintiff did not file a response to the Motion, and Defendants in turn have not filed a reply. Nevertheless, given Plaintiff's *pro se* status, the Court will liberally construe Plaintiff's motion to strike (ECF No. 122) and motion to stay (ECF No. 134) as a collective response to Defendants' Motion.

four pending motions filed by Plaintiff (ECF Nos. 122, 134, 135, 141).[3] For the reasons explained below, the Court grants Defendants' Motion and denies Plaintiff's pending motions.

## II.   BACKGROUND

The following facts are undisputed unless otherwise noted.

At the time of the events in question, Plaintiff was a pretrial detainee at CCDC in relation to a violent felony offense. (ECF No. 111-4 at 15.) Before his booking in 2016, Plaintiff had been subject to "2 to 3" total violent felony charges in the previous 15 years. (*Id.* at 16.) While in pretrial detention, from August 2016 through March 2018, Plaintiff repeatedly engaged in physical violence with other inmates and verbal threats against staff (ECF Nos. 111-1 at 14; 111-10 at 3-5; 111-11 at 4; 111-12 at 12-13, 15-16.) Given Plaintiff's "continuous unsatisfactory history while housed in [CCDC]," Defendant Holm "believe[d] it [wa]s only a matter of time before this inmate attacks and seriously injur[e]s an officer," and thus recommended relocating Plaintiff to maximum-security housing. (ECF No. 111-10 at 5.)

On March 15, 2018, Plaintiff told a CCDC officer during the meal break that his kosher meal was noncompliant because it was "missing his protein." (*Id.* at 2-3.). Holm later reviewed the surveillance footage and found that Plaintiff had hidden the allegedly missing food in his shirt pocket before complaining to CCDC staff.[4] (*Id.* at 3, 5.)

### A.   The March 16, 2018 Incident

The next day, on March 16, 2018, Plaintiff again complained of missing protein in his kosher meal. (*Id.* at 3.) But this time Plaintiff's complaint was "disruptive" and

---

[3]Defendants responded to all three of Plaintiff's pending motions. (ECF Nos. 128, 136, 137.) Plaintiff, however, has not filed any replies.

[4]Defendants dispute that Plaintiff's kosher meal was missing "protein" on March 15, 2018. (ECF No. 111 at 7-8.) They specifically point to surveillance footage during the March 15 meal break, which appears to show Plaintiff (a) taking food from his meal container and placing it in his shirt pocket and (b) moving food from another inmate's food tray into his own container before complaining to an officer. (ECF Nos. 111-16 at 09:32:45-09:33:00, 09:33:50-09:34:10; 111-17 at 2-3.)

included "loud disrespectful outbursts," a demand to speak with Holm, a disregard for an officer's order to stay seated, and an attempt to "get everyone with similar [meal] trays to follow his lead and agree to his cause and protest alongside him." (ECF Nos. 111-10 at 3; 111-12 at 5.) Holm then removed Plaintiff from the meal area and, with help from Defendants Thompson, Heiss, Riesepow, Bryan, and Miller, escorted Plaintiff to another housing unit to initiate disciplinary charges ("March 16 Incident" or "Incident"). (ECF Nos. 111-11 at 3-4; 111-12 at 5-7.)

According to Thompson, during the escort Plaintiff "was threatening the supervisors and officers who were transporting him" and "made it clear that when his hand restraints were removed, he was going to attack Sgt. Holm." (ECF No. 111-10 at 4.) While walking in restraints, Plaintiff "tried to set the pace by pulling the escorting officers." (*Id.* at 5.) Thompson ordered Plaintiff to slow his pace, to which Plaintiff replied, "I walk at my own pace. You keep up with me." (*Id.* at 4.) Around this time, Plaintiff also "was talking over" Holm, insulted Holm, and threatened to file lawsuits. (*Id.* at 5.) Again, Thompson ordered Plaintiff to slow down, but Plaintiff again "pulled away from the officers to the point where they had to stop him and place him up against the wall to address the issue." (*Id.* at 4-5.) Shortly after Plaintiff and Defendants continued the escort, Plaintiff fell forward to the ground, with Thompson and Heiss also falling behind him. (ECF Nos. 111-10 at 4-5; 111-18 at 04:09:15-04:09:20; 111-19 at 2-5.) Plaintiff briefly lay on his stomach before Thompson and Heiss stood him upright again.[5] (*Id.*) Defendants then finished escorting Plaintiff to his cell.

---

[5]In his Complaint, Plaintiff alleges that Thompson "rushed" Plaintiff to the ground, placed his knee on Plaintiff's head after falling, and "jerked, pulled, dragged, and attempted to stand [Plaintiff] upright." (ECF Nos. 1-1 at 4; 5 at 4.) Defendants dispute these allegations in their Motion. (ECF No. 111 at 27 & n.8.) On the day of the Incident, both Holm and Thompson explained that they "unintentionally" fell to the ground with Plaintiff because Plaintiff had "dropped his weight." (ECF Nos. 111 at 27 & n.8; 111-10 at 4-5.) Although the surveillance video does not clearly capture the entire Incident, it shows that Thompson did not place his knee on Plaintiff's head, "jerk" Plaintiff, or "drag" Plaintiff. (ECF No. 111-18 at 04:09:15-04:09:20.)

3

After the Incident, Riesepow spoke with Plaintiff "for several minutes regarding his actions" and reported that Plaintiff "never complained of injury and he did not request medical attention." (ECF No. 111-11 at 4.) "I'm good," Plaintiff later replied, when a nurse asked him about his health the day after the Incident. (ECF No. 111-14 at 2.) Additionally, Plaintiff (1) "denied any injuries sustained during the fall" right after falling and did not request medical care in the days following the Incident, (2) refused to accept continued medication offered by his doctor, (3) showed "[n]o abnormalities" in an x-ray of his cervical spine, and (4) repeatedly reported "no complaints" to CCDC nurses for weeks after the Incident. (ECF Nos. 111-1 at 9; 111-10 at 4; 111-11 at 4; 111-14 at 2; 111-15 at 2-3.)

### B. Plaintiff's Post-Incident Grievances

After the Incident, Plaintiff filed grievances alleging in pertinent part that: (1) Holm had retaliated against Plaintiff when he, among other things, revoked Plaintiff's kosher meal privileges; and (2) CCDC staff refused to treat Plaintiff's head injury caused by his fall during the Incident. (ECF No. 111-2 at 2-6.)

Generally, CCDC's inmate grievance process, outlined in the Inmate Handbook and available in the common areas, requires filing a grievance at "each level of the chain of command." (ECF Nos 111-3 at 2-6; 111-5 at 3; 111-7 at 30.) Specifically, an inmate first must speak to his or her housing unit officer informally and, if "not satisfied" with the officer's response, then must file a formal grievance with that officer and continue appealing up the institutional chain through a sergeant, lieutenant, and deputy chief. (ECF Nos. 111-5 at 3-5; 111-7 at 30.) Plaintiff testified in his deposition that he knew of CCDC's inmate grievance procedure and had access to the Inmate Handbook before the Incident. (ECF Nos. 111-1 at 7; 111-5 at 2-3.)

For his retaliation claim, Plaintiff submitted two first-level grievances—one addressed to a sergeant on March 19, and the other to a lieutenant on March 21. (ECF No. 111-2 at 2-5.) Plaintiff appealed the response to his March 19 grievance, thus submitting one second-level grievance to a captain. (*Id.* at 7-8.) And for Plaintiff's

inadequate medical care claim, Plaintiff submitted two first-level grievances at the sergeant level. (*Id.* at 3, 6.) Plaintiff received responses to both grievances, the second of which explained that a nurse had visited Plaintiff that evening and had informed him that a doctor would see him the following day. (*Id.* at 6.) Plaintiff later testified that he had found this response unsatisfactory because he had wanted to be taken to the hospital for an MRI and CT scans instead of being seen by a nurse. (ECF No. 111-1 at 11.) This lawsuit followed.

### C. This Action

Upon screening of the Complaint under 28 U.S.C. § 1915A, the Court allowed five of Plaintiff's claims to proceed. (ECF No. 5 at 23-24.) However, the Court subsequently dismissed two of these claims, leaving only three claims now before the Court: (1) excessive force in violation of the Fourteenth Amendment;[6] (2) inadequate medical care in violation of the Due Process Clause of the Fourteenth Amendment; and (3) retaliation in violation of the First Amendment.

## IV. DISCUSSION

The Court will first address Defendants' motion for summary judgment (ECF No. 111 ("Motion")) on Plaintiff's three remaining claims. To date, Plaintiff has yet to file a response to the Motion, even after the Court granted several extensions of time and repeatedly warned Plaintiff that it would not grant him any further extensions of time. (ECF Nos. 124, 127, 131, 133.) Instead of a response, Plaintiff has filed a motion to strike Defendants' Motion (ECF No. 122) and a motion to either stay or deny the Motion, including a request for further discovery under Federal Rule of Civil Procedure 56(d) (ECF No. 134). Plaintiff filed additional motions to extend the deadline to file his

---

[6]Because Plaintiff's claim of denial of medical care arose while he was a pretrial detainee at CCDC, this Court examines this claim under the Due Process Clause of the Fourteenth Amendment, in line with Ninth Circuit and U.S. Supreme Court precedents. (ECF No. 5 at 10, 15.) *See also Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979) (citing *Ingraham v. Wright*, 430 U.S. 651, 671-72 & n.40 (1977)); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018).

response to Defendants' Motion. (ECF Nos. 135, 141.) Given Plaintiff's *pro se* status, and because Plaintiff's arguments in these first two motions (ECF Nos. 122, 134) address some of Defendants' arguments and evidence in their Motion, the Court will liberally construe and address both motions as a collective response to Motion.[7] *See Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

### A. Exhaustion

Defendants first move for summary judgment on Plaintiff's retaliation and denial of medical care claims, arguing that Plaintiff has failed to exhaust administrative remedies as required by the Prison Litigation Reform Act ("PLRA"). (ECF No. 111 at 11-15.)

The PLRA requires an inmate to first exhaust administrative remedies before bringing a Section 1983 action in court. 42 U.S.C. § 1997e(a); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015) (noting in dicta that the PLRA, "which is designed to deter the filing of frivolous litigation against prison officials, applies to both pretrial detainees and convicted prisoners"). The PLRA's exhaustion requirement is not "left to the discretion of the district court, but is mandatory." *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citation omitted). The PLRA requires "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90-91, 93.

"[T]he defendant in a PLRA case must plead and prove nonexhaustion as an affirmative defense." *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (citing *Jones v. Bock*, 549 U.S. 199, 212 (2007)). "[T]he ultimate burden of proof remains with the defendant," who must first "prove that there was an available administrative remedy, and

---

[7]*Pro se* parties are held to less stringent standards than those represented by counsel. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972). As such, federal courts liberally construe *pro se* filings. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) ("[P]ro se pleadings are liberally construed, particularly where civil rights claims are involved.") (citations omitted). Nevertheless, *pro se* parties, including Plaintiff, nevertheless must follow the same procedural rules as other litigants. *See Jacobsen*, 790 F.2d at 1364-65.

that the prisoner did not exhaust that available remedy." *Id.* at 1172 (citing *Hilao v. Est. of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996)). Once the defendant has carried its initial burden, the burden then shifts to the incarcerated plaintiff, who must "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* As further explained further below, Defendants have satisfied their ultimate burden of proof. They show that, despite administrative remedies being available, Plaintiff failed to exhaust them in relation to the incidents underlying his retaliation and denial of medical care claims.

Generally, the inmate grievance process requires filing a grievance at "each level of [CCDC's] chain of command." (ECF No. 111-7 at 30.) Specifically, an inmate first must speak to his housing unit officer informally and, if "not satisfied" with the officer's response, must then file a formal grievance with that officer and continue appealing up the institutional chain through a sergeant, lieutenant, and finally deputy chief. (ECF Nos. 111-5 at 3-5; 111-7 at 30.) For his retaliation claim, Plaintiff appears to have submitted two first-level grievances about Holm's alleged retaliatory acts.[8] (ECF No. 111-2 at 2-5.) To be sure, Plaintiff appealed the response to one of these first-level grievances and then filed a second-level grievance to a captain. (*Id.* at 7-8.) But there is no evidence showing Plaintiff appealed his grievance responses up to the deputy chief level, as required by CCDC's inmate grievance procedure. Moreover, Plaintiff testified that he had been familiar with the inmate grievance procedure and had access to the Inmate Handbook before and around March 2018—the time of the incident at issue here. (ECF Nos. 111-1 at 7; 111-5 at 2-3.) Plaintiff presents no evidence showing he completed the

---

[8] Defendants assert that Plaintiff "did not take the first formal step of filing a written grievance" about the incident underlying his First Amendment retaliation claim. (ECF No. 111 at 14.) In two first-level grievances, Plaintiff alleges that Holm "retaliated" against Plaintiff by accusing him of hiding food and lying about missing "protein," later revoking Plaintiff's kosher meal privileges after the events occurring on March 15 and 16, 2018. (ECF No. 111-2 at 2-5.) A CCDC lieutenant responded to Plaintiff's first formal grievance, while Holm, a sergeant, responded to the second grievance. (*Id.* at 2, 5.)

grievance process by appealing either response up to the deputy chief. Because Plaintiff did not submit a grievance through the chain of command—despite knowing of and having access to the inmate grievance procedure while detained at CCDC—the Court grants summary judgment for Defendants on the retaliation claim.

For Plaintiff's denial of medical care claim, Defendants have also established nonexhaustion as an affirmative defense, thus warranting summary judgment. Plaintiff alleges that Defendants repeatedly refused to provide him medical assistance and discouraged others from giving medical assistance after causing Plaintiff's head injury during the March 16 Incident. (ECF No. 5 at 10-11.) Plaintiff submitted two first-level grievances—one submitted on March 19, and the other on March 22—at the sergeant level, each lamenting CCDC staff's refusal to treat his head injury. (ECF No. 111-2 at 3, 6.) Plaintiff received responses to both grievances. (*Id.*) The second response, dated March 22, explained to Plaintiff that a nurse had visited him that evening and informed him that a doctor would see him the following day. (*Id.* at 6.) Plaintiff later testified that he had found the March 22 response unsatisfactory because he had wanted to be taken to the hospital instead of a nurse's visit. (ECF No. 111-1 at 11.) Though Plaintiff had found at least one response unsatisfactory, he offers no evidence showing he appealed either response. Because Plaintiff did not submit any appeals involving his medical emergency-related grievances, the Court finds that Plaintiff failed to exhaust his Fourteenth Amendment denial of medical care claim. Accordingly, the Court also grants Defendants' Motion on the Fourteenth Amendment denial of medical care claim.

### B. Merits of the Fourteenth Amendment Excessive Force Claim

Plaintiff alleges that Defendants violated his Fourteenth Amendment right against excessive force when, upon escorting him from the dining hall to disciplinary housing on March 16, 2018, they (1) pushed Plaintiff against a wall while holding his arm and bending his restrained wrists, (2) slammed Plaintiff's forehead into the wall, and (3) "rushed" Plaintiff to the ground and then performed a knee drop on the side of his head.

(ECF Nos. 1-1 at 4; 5 at 4.) Shortly after falling to the ground, Defendant Thompson allegedly "jerked, pulled, dragged, and attempted to stand [Plaintiff] upright." (*Id.*)

Defendants do not dispute that Thompson placed Plaintiff against the wall while escorting him to disciplinary housing. (ECF No. 111 at 24.) Nor do they dispute that Plaintiff and Thompson both fell to the ground shortly thereafter. (*Id.* at 27.) Instead, they argue that Plaintiff's excessive force claim fails because Defendants acted in an objectively reasonable manner and with a legitimate correctional purpose under the circumstances. (*Id.* at 24-28.) Moreover, they argue, there is no evidence showing that Defendants slammed Plaintiff's head against the wall. (*Id.* at 28-29.) The Court agrees.

As further explained below, Defendants have established that no genuine issue of material fact exists as to whether Defendants' actions were (a) rationally related to the legitimate governmental purpose of maintaining security and order and (b) objectively reasonable in relation to that purpose. In turn, Plaintiff does not present any specific facts showing that a dispute exists to preclude summary judgment. *See Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002). Accordingly, the Court grants the Motion on the excessive force claim.

1. **Legal Framework**

The Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment," as opposed to the Eighth Amendment's protection against deliberate use of force after conviction. *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979)); *see City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.") To determine whether the Due Process Clause is violated, "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398 (citations omitted); *see also Bell*, 441 U.S. at 560-61 (finding that a jail's

security restrictions and practices did not constitute "punishment" in violation of the Due Process Clause because, in pertinent part, they were "reasonable responses" to the "legitimate nonpunitive governmental purpose" of maintaining security and order).

So even if a defendant's use of force is rationally related to a legitimate governmental purpose, a pretrial detainee may still prevail if the force used is, constitutionally speaking, objectively unreasonable. See Kingsley, 576 U.S. at 397-98. Although objective reasonableness is highly fact-and context-specific and cannot be applied "mechanically," the Court must make this determination by balancing several factors "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. at 397 (citing Graham, 490 U.S. at 396). These reasonableness factors include: (1) "the relationship between the need for the use of force and the amount of force used"; (2) "the extent of the plaintiff's injury"; (3) "any effort made by the officer to temper or to limit the amount of force"; (4) "the severity of the security problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was actively resisting." Id. The Court also "must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." Id. at 399-400.

    **2.    Analysis**

        **a.    Legitimate Governmental Objective**

Defendants have first established that, under the circumstances, Defendants' actions during the March 16 Incident were "rationally related to a legitimate governmental objective," namely, that of maintaining order and institutional security at CCDC. See Kingsley, 576 U.S. at 398 (citing Bell, 441 U.S. at 561)). Thompson placed Plaintiff against the wall and restrained him on the ground during the escort so he could regain physical control of Plaintiff, a tall man, after Plaintiff had (1) spoken over and cursed at Holm, (2) defied officers' orders, (3) encouraged other inmates to join in his

defiance, (4) quickened and tried setting the walking pace, and (5) pulled away from Thompson and Heiss during the escort. (ECF Nos. 111-10 at 4-5; 111-20 at 3; 111-22 at 2-3.) Also reinforcing Thompson's need to regain physical control over Plaintiff was Plaintiff's in-custody history of physical violence against inmates and verbal threats against staff. (ECF Nos. 111-1 at 14; 111-10 at 3-5; 111-11 at 4; 111-12 at 12-13, 15-16.) Further, Plaintiff's 2016 booking records state that his pretrial detention was in relation to a violent felony offense, and that he had had "2 to 3" total violent felony charges in the previous 15 years. (ECF No. 111-4 at 15-16.) The evidence shows that, in a good-faith effort to maintain security and order, Defendants sought to regain physical control of an inmate actively defying Defendants' orders and had a known history of engaging in physical violence and verbal threats. And because Plaintiff offers no objective evidence showing that Defendants' actions were not rationally related to a legitimate governmental objective at CCDC, *see Kingsley*, 576 U.S. at 398, the Court finds that Defendants' actions do not violate the Fourteenth Amendment Due Process Clause on this basis.

### b.     Objective Reasonableness

Nor were Defendants' actions excessive from the perspective of a reasonable officer on the scene, who often must make split-second decisions in tense situations. *See Kingsley*, 576 U.S. at 397, 399-400; *Graham*, 490 U.S. at 396. The *Kingsley* factors, on balance, weigh against a finding of excessive force used against Plaintiff.

The first and sixth *Kingsley* factors—the relationship between the need for the use of force and the amount of force used and whether Plaintiff was actively resisting, respectively—both weigh against a finding of excessive force used. During the escort, Plaintiff was actively defying Thompson's orders, speaking over and cursing at Holm, encouraging other inmates to join in defiance, quickening his walking pace, and pulling away from Thompson and Heiss. (ECF Nos. 111-10 at 4-5; 111-20 at 3; 111-22 at 2-3.) And, contrary to Plaintiff's allegations, the surveillance video of the escort does not show

Thompson dropping his knee onto Plaintiff's neck after they both fall to the floor.[9] (ECF Nos. 1-1 at 4; 5 at 4; 111-1 at 8, 111-11 at 4; 111-18 at 04:09:15-04:09:20; 111-19 at 2-5.) Even assuming that Thompson forced Plaintiff's head against the wall, Plaintiff's open defiance of correctional orders would lead a reasonable officer in Thompson's position to believe that at least some use of force was objectively reasonable. Thompson's use of force, while excessive in Plaintiff's view, reasonably sought to gain Plaintiff's compliance and regain physical control over him during a tense disciplinary housing escort.

The second *Kingsley* factor—the extent of Plaintiff's alleged injury—also weighs against Plaintiff. Though Plaintiff had refused to sign a medical refusal report after the Incident, the record shows that Plaintiff also: (1) "denied any injuries sustained during the fall" and stated "I'm good" regarding his health the day after the Incident; (2) did not request medical attention in the three days between the Incident and the filing of his grievance; (3) refused to accept continued medication offered by his doctor; (4) showed "[n]o abnormalities" in an x-ray of his cervical spine; and (6) repeatedly reported "no complaints" to CCDC nurses for weeks following the Incident. (ECF Nos. 111-1 at 9; 111-10 at 4; 111-11 at 4; 111-14 at 2; 111-15 at 2-3.)

The third *Kingsley* factor—an officer's efforts to temper or limit the amount of force used—also weighs against Plaintiff. Before the Incident, Plaintiff had defied officers' orders in the chow hall at least twice and had encouraged fellow inmates to join in his defiance. (ECF No. 111-10 at 3-5.) Thompson first gave Plaintiff verbal orders to slow his pace during the escort, which Plaintiff disobeyed by picking up his pace and pulling away from Thompson and Heiss. (ECF Nos. 111-10 at 4-5; 111-20 at 3; 111-22 at 2-3.) Even assuming that Thompson intentionally caused Plaintiff to fall down thereafter, surveillance footage shows that Thompson did not apply a "knee drop" on Plaintiff's

---

[9] In the CCDC surveillance video, a structural column and a correctional officer's body block most of the view of Plaintiff and Thompson as Thompson places Plaintiff against the wall. (ECF No. 111-18 at 04:09:06-04:09:15.) So it is unclear whether Thompson "slammed" Plaintiff's forehead against the wall at this moment as Plaintiff alleges. (ECF Nos. 5 at 4; 111-11 at 4 (noting that "[v]ideo of this specific moment is dark and unable to make out").)

head. (ECF No. 111-18 at 04:09:15-04:09:20.) From the perspective of a reasonable officer in Thompson's position, Thompson's verbal orders and placement of Plaintiff against the wall after Plaintiff's defiance of repeated orders are evidence of Thompson's attempts to temper his use of force.

The fourth *Kingsley* factor—the severity of the security problem at issue—weighs quite heavily against Plaintiff. As previously noted, the reason for Plaintiff's disciplinary housing escort in the first place was Plaintiff's defiance of CCDC officers' orders in the chow hall. (ECF No. 111-10 at 4-5.) And Plaintiff's open defiance of Defendants' orders during the Incident, coupled with an extensive in-custody history of physical violence and verbal threats, further justified Defendants' fear that Plaintiff would harm Defendants and other CCDC staff. (ECF Nos. 111-1 at 14; 111-10 at 3-5; 111-11 at 4; 111-12 at 12-13, 15-16.) As Thompson reported the day of the Incident, Plaintiff was "threatening the supervisors and officers who were transporting him" and "made it clear that when his hand restraints were removed, he was going to attack Sgt. Holm." (ECF No. 111-10 at 4.) According to Holm's incident report, Plaintiff "uses his size to gain backing from inmates in the housing units, and he attempts to intimidate staff as well." (*Id.* at 5.) Holm also stated "believ[ing] it is only a matter of time before [Plaintiff] attacks and seriously injures an officer." (*Id.*) When viewing the facts in the light most favorable to Plaintiff, the Court finds that Defendants reasonably perceived Plaintiffs' actions as a security threat—weighing the fifth *Kingsley* factor against Plaintiff as well.

On balance, and in "deference to policies and practices needed to maintain order and institutional security," *Kingsley*, 576 U.S. at 399-400, the Court finds that Defendants' use of force was objectively reasonable. Thus, the Court concludes that Defendants are entitled to summary judgment on the Fourteenth Amendment excessive force claim, and it declines to reach the merits of Defendants' qualified immunity argument. And overall, the Court grants Defendants' Motion on all three of Plaintiff's remaining claims.

///

### D. Other Pending Motions (ECF Nos. 122, 134, 135, 141)

#### 1. Motion to Strike (ECF No. 122)

Plaintiff seeks to strike Defendants' Motion "in its entirety." (ECF No. 122 at 2.) Given Plaintiff's *pro se* status, the Court liberally construes this motion as a response to Defendants' Motion because it challenges the admissibility of one piece of evidence.[10]

Even if the Court had not so construed, the Court would nevertheless deny Plaintiff's motion to strike because Plaintiff has erroneously invoked Federal Rule of Civil Procedure 12(f) to strike Defendants' Motion. "Under Rule 12(f) a court may strike from a pleading any redundant, immaterial, impertinent, or scandalous matter. However, motions to strike apply only to pleadings, and courts are generally unwilling to construe the rule broadly and refuse to strike motions, briefs, objections, affidavits, or exhibits attached thereto." *Herb Reed Enter., LLC v. Fla. Ent. Mgmt., Inc.*, Case No. 2:12-cv-00560-MMD-GWF, 2014 WL 1305144, at *6 (D. Nev. Mar. 31, 2014) (citations omitted). The Court thus refuses to strike Defendants' Motion under Rule 12(f), and denies Plaintiff's motion to strike.

#### 2. Motion to Stay (ECF No. 134)

Plaintiff also moves to either stay or deny Defendants' Motion and, as the Court construes it, seeks leave to conduct further discovery under Rule 56(d). (*See generally*

---

[10] In his motion to strike, Plaintiff seeks to exclude Defendants' copy of CCDC's Standard Operating Procedure ("SOP") about the inmate grievance procedure. (ECF No. 122 at 3-4.) Plaintiff appears to argue that the SOP is inadmissible as an unauthenticated document and as hearsay evidence. (*Id.* at 3.) Plaintiff also argues that Defendants were late in disclosing the SOP to him during discovery. In response, Defendants correctly point out that, contrary to Plaintiff's assertions, the Court can consider this evidence on summary judgment. (ECF No. 128 at 6-7.) Also, Defendants show that, while the SOP was initially confidential while Plaintiff was incarcerated, they repeatedly tried to work with Plaintiff to grant him access. Specifically, Defendants asked Plaintiff to sign a Stipulated Protective Order that would allow him to access the SOP on the inmate grievance process. (ECF Nos. 128 at 9-10; 128-1; 128-2; 128-3; 128-7 at 5.) Plaintiff ultimately refused to sign the Stipulated Protective Order. (ECF Nos. 128 at 10; 128-4 at 4.) After Plaintiff's release from custody in November 2022, Defendants provided him the SOP, ultimately attached as Exhibit C to Defendants' Motion. (ECF Nos. 111-3; 128 at 10; 128-5 at 29-33.)

14

ECF No. 134.) The Court denies this motion because Defendants are entitled to summary judgment.[11]

Plaintiff is not entitled to Rule 56(d) relief. Because Plaintiff (1) had realistic opportunities to pursue discovery relating to the theory of his case, (2) received several pertinent documents from Defendants, (3) repeatedly ignored his discovery obligations over the five-times-extended discovery period, and (4) waited until over three months after the dispositive motions deadline to seek Rule 56(d) relief, Plaintiff fails to show he has diligently pursued previous discovery opportunities, and that allowing additional discovery would have precluded summary judgment. (*See, e.g.*. ECF Nos. 36, 40, 48, 72, 81 (granting extensions to discovery period); 113 (extending dispositive motions deadline; instructing Plaintiff to respond to interrogatories).) *See also* LR 26-3; *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1179 (9th Cir. 2006) (suggesting it would not be diligent to "move[ ] the court to compel discovery only *after* the deadlines for discovery or submission of dispositive motions had passed"); *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1005 (9th Cir. 2002); *Qualls v. Blue Cross of Cal., Inc.*, 22 F.3d 839, 844 (9th Cir. 1994); *Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986); *Garcia v. Serv. Emps. Int'l Union*, 332 F.R.D. 351, 354 (D. Nev. 2019) (collecting cases).

### 3. Motions to Extend Time (ECF Nos. 135, 141)

Because Defendants are entitled to summary judgment, the Court also denies as moot Plaintiff's motions to extend time and to stay (ECF Nos. 135, 141).

///
///
///
///

---

[11]The Court advises Plaintiff that a stay is "[a]n order to suspend all or part of a judicial proceeding or a judgment resulting from that proceeding," such as discovery. Black's Law Dict. (11th ed. 2019).

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Defendants' motion for summary judgment (ECF No. 111) is granted.

It is further ordered that Plaintiff's pending motions (ECF Nos. 122, 134, 135, 141) are denied.

It is further ordered that the Clerk of Court enter judgment accordingly and close this case.

DATED THIS 27th Day of June 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE